## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MULTI-FINANCIAL SECURITIES CORP.      :
     :
           Plaintiff,      :      CIVIL ACTION NO. 02-3828
     :
    vs.      :
     :
ARLENE BROWN      :
     :
           Defendant.      :

## PLAINTIFF, MULTI-FINANCIAL SECURITIES CORP.'S, RESPONSE TO DEFENDANT, ARLENE BROWN'S, MOTION TO COMPEL ARBITRATION/MOTION FOR SUMMARY JUDGMENT

Plaintiff, Multi-Financial Securities Corp. (hereinafter referred to as "Multi-Financial"), by and through its counsel, Marshall, Dennehey, Warner, Coleman & Goggin, hereby file its response to Defendant, Arlene Brown's (hereinafter referred to as "Brown"), Motion to Compel Arbitration/Motion for Summary Judgment (hereinafter referred to as the "Motion") and avers as follows:

## I.    INTRODUCTION

On or about or about March 12, 2002, Brown filed a Statement of Claim with National Association of Securities Dealers ("NASD") asserting various vicarious liability allegations over and against Multi-Financial and direct claims against its former registered representatives, George and Kevin Brown.  The Statement of Claim erroneously alleges that this controversy arises out of Brown's purchase of certain "Evergreen promissory notes" from George or Kevin Brown.  However, such promissory notes were purchased by Intrados, S.A. an offshore trustee of an account opened by Brown for asset protection purposes.

Since Brown did not purchase any alleged promissory notes from George or Kevin Brown; since she created an offshore trust account and did not have on account with Multi-Financial; and since she did not receive any account statements, confirmations or any other correspondence from Multi-Financial regarding her trust, any promissory notes or anything else she is not a customer of Multi-Financial.

Further, Multi-Financial does not have a duty to supervise an unrelated offshore trustee's alleged purchase of a debt instrument.  Therefore, the complained of purchase by Intrados did not arise in connection with the business of Multi-Financial.

Since Brown is not a customer of Multi-Financial and the complained of transaction did not arise out of or in connection with the business of Multi-Financial, this matter must not be compelled to arbitration under the National Association of Securities Dealers ("NASD") Rules 10101 and 10301, and Defendant's Motion for Summary Judgment and Motion to Compel must be denied.

## II.    STANDARD OF REVIEW

### A.    Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party moving for summary judgment has the initial burden of showing the basis for its motion.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to go beyond the mere pleadings and present evidence through affidavits, depositions, or admissions on file to show that there is a

genuine issue for trial.  See id. at 324.  A genuine issue is one in which the evidence is such that

a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

When deciding a motion for summary judgment, a court must draw all reasonable

inferences in the light most favorable to  the non-movant.  Big Apple BMW, Inc. v. BMW of N.

Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912, 113 S. Ct. 1262, 122

L. Ed. 2d 659 (1993).  Moreover, a court may not consider the credibility or weight of the

evidence in deciding a motion for summary judgment, even if the quantity of the moving party's

evidence far outweighs that of its opponent.  Id.  Nonetheless, a party opposing summary

judgment must do more than just rest upon mere allegations, general denials or vague statements.

Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

### B.    Motion to Compel Arbitration

Additionally, in appropriate circumstances, 9 U.S.C. § 4 allows litigants to obtain an

order requiring a reluctant party to arbitrate a dispute, as it directs the district court to order a

party to arbitrate if it is "satisfied that the making of the agreement for arbitration or the failure to

comply therewith is not an issue."  PaineWebber Inc. v. Hartmann, 921 F.2d 507, 510 (3d Cir.

1990).  But under section 4 when one party refuses to arbitrate, the issue of whether the dispute

is within the scope of the agreement requires district court resolution.  See AT & T Techs., Inc.

v. Communications Workers of Am., 475 U.S. 643, 649, 106 S. Ct. 1415, 1418, 89 L. Ed. 2d 648

(1986); PaineWebber, 921 F.2d at 510-11. There is an issue in dispute in those circumstances

because arbitration is "fundamentally a creature of contract," Kaplan, 19 F.3d at 1512, and thus

arbitrators have the authority to resolve disputes only if the parties have agreed to submit to

arbitration.  See AT&T Techs., 475 U.S. at 648, 106 S. Ct. at 1418 (""Arbitration is a matter of

contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'"). Accordingly, for a court to enter an order compelling arbitration there must be sufficient evidence that the parties consented to arbitration in an express agreement. See United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S. Ct. 1347, 1353, 4 L. Ed. 2d 1409 (1960); PaineWebber, 921 F.2d at 511; Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51, 54 (3d Cir. 1980).

If a court determines that a valid arbitration agreement does not exist or that the matter at issue clearly falls outside of the substantive scope of the agreement, it is obliged to enjoin arbitration. See id. If, on the other hand, the court determines that an agreement exists and that the dispute falls within the scope of the agreement, it then must refer the matter to arbitration without considering the merits of the dispute. See AT & T Technologies, 475 U.S. at 649-50; Beck v. Reliance Steel Products Co., 860 F.2d 576, 579 (3d Cir. 1988).

In this matter, the parties have not entered into an arbitration agreement. Since an arbitration agreement does not exist, the only way that this matter can be compelled to arbitration is if it is eligible for arbitration under NASD Rule 10101. However, according to the undisputed evidence as discussed below, this matter is not eligible for arbitration under NASD Rule 10101.

## III.    COUNTER-STATEMENT OF FACTS

### A.    Asset Protection Trust

In or around spring 1996, Brown allegedly met with George and/or Kevin Brown in regard to structuring and protection of her assets. (See Plaintiff's Complaint, attached hereto as Exhibit "A" and George and Kevin Brown's Answer to the NASD, attached hereto as Exhibit "B.") At the time of this meeting, Brown's concerns, in regard to her assets, centered on protecting assets that she had accumulated for the benefit of her children by her earlier marriage. (See Exhibit "B.") According to George and Kevin Brown's Answer to Brown's Statement of

4

Claim, the term "asset protection" covers a wide range of steps, procedures and legal vehicles, which are available for consideration by persons who are concerned about protecting assets from third party claimants.  (See Exhibit "B" at page 4.)  Some times fairly and inaccurately associated only with tax avoidance considerations, the possible solutions available are varied as the concerns that generate the need for protection:  marital difficulties, second marriages, creditors' claims, litigation (both actual and potential), and so on.  (See Exhibit "B".)

One protection strategy is the placement of assets in a financial institution in a foreign jurisdiction, usually one whose banking or financial laws have strict confidentiality regulations and permit the acquisition of assets by a trustee (usually a financial institution or trust company) from a donor who parts with virtually all aspects and indicia of ownership.  (See Exhibit "B".)  The person utilizing such an asset protection strategy does so in order that "ownership" is removed and attributed to the trustee and no longer to the donor.  (See Exhibit "B".)  This is most often done pursuant to a trust agreement which sets forth not only the termination of ownership rights by the donor but the anticipated disposition of the assets in the future.  (See Exhibit "B".)

Consistent with the trustee's intended right to invest the proceeds at the trustee's discretion, the donor's desires need not be followed but may be expressed in a "Letter of Wishes."  This brief writing does two things.  (See Exhibit "B" at page 5.)  First, it acknowledges that the <u>trustee is not obligated to obey</u> the donor's intentions.  (See Exhibit "B".)  Secondly, it expresses the donors intentions such as they may be in regard to prospective deployment of the funds and assets that are now in the trust.  (See Exhibit "B".)  The trustee is, of course, free to make investments in its own best judgment and to disregard the donor's suggestion or "wishes". (See Exhibit "B".)

In the course of his dealings in such matters, both in regard to specific clients and as a matter of general professional knowledge on his part, George Brown came to be familiar with Intrados, S.A., a financial institution based in Costa Rica.  (See Exhibit "B".)  A brochure describing its services, its experience and its capability is attached as Exhibit "A" to Mr. Brown's Answer to Defendant's Statement of Claim.  Mr. Brown also met with officers of Intrados.  (See Exhibit "B".)  Mr. Brown received and reviewed materials re: the management of one of Intrados routine placement of trust (See Exhibit "B" at Page 5.)  Those materials are attached as Exhibit "B" to Mr. Brown's Answer to the Statement of Claim, describing Atlantic Portfolio Analytics & Management, based in Orlando.  (See Exhibit "B" at page 5.)

**B.    Brown's Intrados Offshore Trust**

Thereafter, Brown contacted American Preferred Service, a company George Brown utilizes seeking advice regarding assets protection services.  (See Exhibit "B".)  Brown later decided to create an offshore trust with Intrados as a trustee to protect a portion of her assets about which she was concerned because of marital difficulties.  (See Exhibit "B" at Page 6.)

At the onset of her decision to place her assets with Intrados, Brown entered into a trust agreement with Intrados as trustee.  (See trust documents, attached hereto as Exhibit "C" of Exhibit "A".) According to Brown's trust agreement dated July 12, 1996 with Intrados:

> Trustee shall hold, manage and distribute the trust estate for the uses and purposes and upon the terms and conditions herein set forth.  The trustee acknowledges receipt of title to the initial property of the trust, described as Schedule "A", attached hereto and agrees that said property, as well as all additions thereto, shall be held in trust according to the terms of this trust as set forth herein.  (See Page 1 of Trust Agreement.)
>
> 4.5 The interest of any beneficiary in the income or principal of this trust may not be anticipated, alienated, encumbered or otherwise assigned.  No interest shall be subject to the claims of

> such beneficiaries' creditors, spouse, divorced spouse, or others, or
> to legal, charitable, or other proceedings related thereto.
>
> 5.2(A) [The powers of the trustee include the power to] sell,
> convey, exchange, convert, improve, repair, manage, operate,
> control, encumber, hypothecate, purchase or acquire by any lawful
> means of property of any type for investment and reinvestment in
> the trust estate.

Brown signed the trust agreement on July 12, 1996. Brown also executed a Beneficiary Information Page indicating that contributions to the trust conform with the dispositive provisions of the 1996 living trust of Arlene Brown dated July 29, 1996 and listing Alicia Greenberg and Mark Greenberg as her first and secondary beneficiary. (See Exhibit "C" of Exhibit "A".) Brown also completed a Trust Acceptance form under which she indicated that she would like to accumulate in the trust any income from investments. (See Exhibit "C" of Exhibit "A".) Brown also executed a "Letter of Wishes" addressed to Intrados which provided:

> A trust has been established in which I am a settlor and/or the
> beneficiary, and you are the trustee. I realize that the trust is
> totally discretionary and that you as trustee may exercise your
> discretion however you see fit, subject to the terms of the trust and
> your fiduciary obligations as trustee.
>
> While you may certainly like to ignore the suggestion, I would
> request that the trust funds be invested in a stable yield certificate
> issued by Honor, F.A., a Cayman Island Corporation. I intend to
> fund my trust with U.S. $30,000.00. (See Exhibit "C" of Exhibit
> "A".)

Brown's trust number was 22101. (See Exhibit "C" of Exhibit "A".)

Brown completed IRS Form 926, IRS Form 3520 and IRS Form 90-22.1 in connection with the establishment of her trust. (See Exhibit "D" of Exhibit "A".) According to Brown's Form 926, she certified that she was transferring $30,000.00 cash to Intrados Trust as trustee, P.O. Box 886-1250, Escazu, Costa Rica. (See Exhibit "D" of Exhibit "A".) According to Brown's Form 3524, her trust was created with Intrados on July 29, 1996. She transferred

$30,000.00 to the trust and the trust beneficiaries were Alicia Greenberg and Mark Greenberg. Furthermore, the trust had a termination date of July 29, 2016 and that the trustee has possession of all trust records.  (See Exhibit "D" of Exhibit "A".)

Brown's IRS Form 99-22.1 specified that Brown's trust was in the name of Intrados Trust and that the account was a trust account.  (See Exhibit "D" of Exhibit "A".)  Specifically, Brown did not indicate that the trust account was a securities account pursuant to Form 90-22.1 §9(e). (See Exhibit "D" of Exhibit "A".)  Thereafter, Brown submitted her completed trust documents to Ronald T. Murphy, an attorney located in Lakeland, Florida which represents Intrados  (See Exhibit "E" of Exhibit "A".)  Murphy advised Brown that he received Trust No. 22101 and was advised that the trust was prepared in connection with, among other things, **asset protection**. (See Exhibit "E" of Exhibit "A") (emphasis added).  Murphy further advised Brown that all of the trust documents were in order and that he was forwarding the trust package to Intrados for final execution on behalf of the trustee.  In the event that Brown would wish to alter, modify or otherwise change the distribution or obtain information from the trustee, she was directed to call an overseas phone number or send a Letter of Wishes to the trustee at P.O. Box 886-1250, Escazu, Cost Rica, Central America.  Such request would be forwarded through the offices of Mr. Murphy.  (See Exhibit "E" of Exhibit "A".)

In August 1996, Brown drew two check to Intrados, one for $30,000 to constitute the initial Trust Corpus and another $400 for the trust creation fee and other administration expenses.  (See Exhibit "B" of Exhibit "A".)  The trustee received an Honor F.A. Certificate indicating that it purchased 30,000 units of the Honor, F.A. in the trust account at a $1/unit.  (See Exhibit "F" of Exhibit "A", Honor, F.A. Certificate.)   Intrados was the owner of the units not

Brown.  (See Exhibit "F" of Exhibit "A".)  Therefore, Brown <u>did not purchase</u> any units of the Honor fund.

Thereafter, on or about November 21, 1996, Brown provided Murphy with a check for $20,000.00 payable to Intrados for deposit into her existing Trust No. 22101 for a cumulative total of $50,000.00.  (See Exhibit G" of Exhibit "A".)  Brown also executed a Letter of Wishes in connection with her subsequent deposit, once again requesting that the deposit be invested in a stable year certificate issued by Honor, F.A.  (See Exhibit "H" of Exhibit "A", Letter of Wishes.)  The trustee received a certificate from Honor, F.A. representing the trustees purchase of 20,000 units in Honor, F.A. at $1/unit.  (See Exhibit "I" of Exhibit "A".)  Brown was neither the purchaser nor owner of the Honor, F.A. stable yield certificate.

Accordingly, Brown was at all times aware that she had created an offshore trust at a financial institution in Costa Rica where the assets placed in her trust were under the total control of the trustee in that jurisdiction and that said trustee was not affiliated with Multi-Financial.

### C.   <u>Honor, F.A. Becomes Evergreen</u>

George and Kevin Brown's Answer to Brown's Statement of Claim contains the following averments regarding what happened to the trustee Honor, F.A. Certificates after they were purchased.  According to the Browns' Answer to Claimant's Statement of Claim, the Statement of Claim cavalierly and erroneously describes the investment in the Honor Fund S.A. as alternatively named Evergreen Security Fund and "Stable Yield Fund".  (See Exhibit "B" at page 10.)  Ms. Brown never heard of the Evergreen Fund and was not understood to have ever invested in Evergreen until "shocking" disclosures in early 2001 came to be known.  Ms. Brown's Costa Rican trust position was understood throughout as being in the Honor Fund, S.A. which was described previously.  (See Exhibit "B" at page 10.)

Later in the '90s generally through networking contacts and financial services resources with which George Brown came to be acquainted, a comparable asset protection structure was utilized through a Bahamian financial institution called Surety Bank & Trust Co.  (See Exhibit "B" at page 10.)  Though the same Florida-based attorneys and sponsors, some of George Brown's later customers, but not Arlene Brown, utilized Surety Bank & Trust through comparable assets protection trust arrangements in their trusts – not Arlene Brown's trust – invested in the Evergreen, Ltd., which was understood to have the same type of investment portfolio and as the Honor Fund S.A., and employed the same strategies.  Brown set forth these events only for their context and to demonstrate the factual admission and inaccuracies of the Statement of Claim.  (See Exhibit "B" at page 11).

In late 2000, George Brown was informed that the management of Evergreen was being conveyed to new owners and that a new Evergreen Fund was contemplated and that it would have a listing on the Bahamian Stock Exchange.  George Brown was concerned that this evolution of Evergreen was inconsistent with the asset protection and confidentiality considerations of his clients.  He was advised that his later clients whose trust had invested in Evergreen would be given an opportunity to withdraw from Evergreen.  Mr. Brown was also told by the staff in Orlando in late December, 2000 that trust companies holding Honor Fund on behalf of asset protection trust would be given the same opportunity to exchange into the new Evergreen Fund.  This point was never clarified nor put in writing.  Again, the Brown's emphasized that these events were not understood to involve Arlene Brown (See Exhibit "B" at page 11).

In 2001 anticipated redemptions had not occurred.  When George Brown visited the Florida offices where he understood the management of Evergreen's portfolio was conducted and

received as what can best be described as unsatisfactory explanations.  The Browns again point out that these activities were not understood to involve Arlene Brown.  (See Exhibit "B" at page 11).

Within a day or two of that meeting in Florida, George Brown learned that the Evergreen Fund filed a petition to the Bankruptcy Courts in Central Florida.  Thereafter, he was "shocked to learn" that the Claimant's trustee had elected to have Honor Fund S.A. invest in some manner in a merger with Evergreen.  (See Exhibit "B" at page 13).

**IV.    DISPUTED MATERIAL FACTS WHICH REQUIRE THE DENIAL OF PLAINTIFF'S MOTION TO COMPEL ARBITRATION AND MOTION FOR SUMMARY JUDGMENT**

In support of Defendant's Motion to Compel Arbitration and Motion for Summary Judgment ("Defendant's Motion"), Defendant relies upon no less than two "facts" which are disputed by plaintiff.  Defendant alleges that she purchased promissory notes in the Intrados S.A. Honor, Evergreen Securities, Ltd. "Stable Yield Fund" ("promissory notes") and that she was aware of the relationship and association between the Browns and Plaintiff.  However, these "facts" are not supported by the evidence attached to Plaintiff's Complaint, the Answer of George and Kevin Brown to Defendant's NASD Statement of Claim nor any "evidence" or documents attached by Defendant to her Motion for Summary Judgment and Motion to Compel Arbitration.

Paragraph 3, page 2 of Defendant's Motion alleges that George and Kevin Brown effected the sale of two Notes in the Intrados S. A. Honor, Evergreen Securities, Ltd. "Stable Yield Fund" in the amount of $30,000 and a $20,000, respectively.

**A.    Defendant Did Not Purchase Promissory Notes**

Paragraph 3, page 2 further alleges that "while MFSC and the Browns contest the extent of their role in the sale of these securities to Ms. Brown …".

Paragraph 3, page 3 alleges that "… in or about January, 2002, it became exceeding[ly][sic] apparent that Honor F.A., Evergreen Securities Interests sold to Ms. Brown was in fact a "scam" …".

Paragraph 2, page 5 alleges that "… George and Kevin Brown were associated with MFSC as registered representatives or stock broker at the time the securities were sold alleged to have been sold to Ms. Brown."

However, the defendants do not rely upon nor provide the court as an exhibit, any document, other than the unsupported allegations of Defendant's NASD Statement of Claim, which support their allegation that defendant purchased the promissory notes.  To the contrary, plaintiffs have attached a comprehensive set of documents relative to this matter which clearly indicate that Intrados, S.A. was in fact the purchaser of the promissory notes not claimant.  Each document in support of defendant's averment that Intrados was in fact the purchaser of the promissory note is attached to the Plaintiff's Complaint at Exhibit "C", Exhibit "D", Exhibit "E", Exhibit "F", Exhibit "G", Exhibit "H", Exhibit "I", Exhibit "J".  Therefore, this material fact is disputed by plaintiffs.

Whether or not claimant was in fact the purchaser of the promissory notes is material to this matter since defendant alleges that George and/or Kevin Brown's "sale of a promissory note" to defendant is a "selling away" activity which involves the sale of a security to an individual without the knowledge and/or approval of the broker-dealer, Multi-Financial.  Defendant alleges that the sale of such a security by a registered representative of a broker-dealer is an activity which must be supervised by the broker-dealer and, therefore, falls within the business of the broker-dealer and requires that this matter be arbitrated according to various case law cited in defendant's brief (which are easily distinguishable and discussed in more detail below and would

in any event not require that this matter be arbitrated).  Therefore, whether or not defendant was

the "purchaser of an Evergreen Promissory Note" is disputed by the record of this case and

creates genuine issue of material fact which requires that Plaintiff's Motion for Summary

Judgment and Motion to Compel Arbitration be denied.

**B.      Defendant Lacks Evidence To Establish Knowledge of Relationship Of Browns And Multi-Financial**

Defendant also alleges at paragraph 2, page 6 of her Motion for Summary Judgment that

defendant was aware of the relationship and association between the Browns and MFSC, at the

time Ms. Brown was sold unregistered securities.  In support of this averment, defendant's

counsel, without the support of an affidavit of defendant or any deposition testimony or

otherwise, draws cursory conclusions from exhibits attached to defendant's motion.  Defendant's

counsel's cursory conclusions from these documents is disputed by plaintiffs and, furthermore,

cannot form the basis for a Motion for Summary Judgment and/or Motion to Compel.

For example, Exhibit "C" to Defendant's Motion consists of checks written from

defendant to Intrados which were allegedly received by George Brown on July 26, 1996.

However, there is no deposition testimony or affidavit from defendant which would indicate that

as a result of sending checks to Intrados allegedly through George Brown, that Ms. Brown was

"aware of the relationship and association between Browns and MFSC".

Furthermore, Exhibit "C" includes George Brown's signature as a witness on defendant's

Intrados' trust document.  Once again, defendant fails to provide the court with any affidavit

and/or deposition testimony or otherwise which would indicate that Mr. Brown's signature as a

witness on the trust document lead her to be aware of the relationship and association between

the Browns and MFSC.

Defendant also refers to a Federal Express airbill as Exhibit "D", dated November 20, 1996, which defendant's counsel alleges refers to a Federal Express of defendant to Ronald T. Murphy enclosing her check to Intrados.  However, both the letter to Mr. Murphy and the check of Ms. Brown are dated November 21, 1996, one day after the airbill.  Defendant fails to provide an affidavit and/or deposition testimony or otherwise which would support her attorney's conclusory allegation that the airbill and Intrados check and letter to Ronald Murphy are related. Defendant also attaches as Exhibit "E" a note from George Brown to defendant under Mr. Brown's personal letterhead which, according to defendant's counsel's conclusory allegations, refers to the trustee's purchase of promissory notes.  However, this note does not refer to Multi-Financial, nor is it supported by any affidavit or deposition testimony or otherwise indicating that this led defendant to be aware of the relationship and association between the Browns and MFSC.

Furthermore, at Exhibit "F" defendant includes the business card of Messrs. George and Kevin Brown.  However, Defendant's Motion does not include any affidavit and/or deposition testimony or otherwise which would support her attorney's conclusory allegation that this business card was provided to defendant or somehow made her aware of the relationship and association between the Browns and MFSC.

Defendant also attaches as Exhibit "G" to her Motion, a note from Kevin Brown to defendant enclosing the last statements received for Evergreen.  Once again, defendant did not attach an affidavit, deposition testimony or otherwise, which would support her attorney's conclusory allegation that this note in any way supports his allegation that Brown was aware of the association of George and Kevin Brown with MFSC.

Finally, defendant attaches information regarding George P. Brown Investment Advisors, Inc., as well as the resume of George and Kevin Brown at Exhibit "A" and Exhibit "B". (It should be noted that plaintiffs have yet to be served with a copy of the Defendant's Motion which would include exhibit tabs to identify any exhibits attached to Defendant's Motion.) However, once again defendant did not attach an affidavit and/or deposition testimony to support her attorney's conclusory allegation that this information was either received by the defendant and/or lead her to believe and/or understand of any association between the Browns and Multi-Financial.

Furthermore, the George Brown, Kevin Brown and Geo. P. Brown Investment Advisors, Inc. answer to Defendant's NASD Statement of Claim alleges that Multi-Financial had no involvement whatsoever in the activities at issue and defendant was never lead to believe nor did she understand that to be the case. (Exhibit "B" at page 2).

Therefore, the evidence related to this matter clearly establishes that defendant was not the purchaser of any Evergreen Promissory Notes and there is no testimony by way of affidavit and/or deposition to support defendant's attorney's conclusory allegations that she received various documents and/or said documents in any way lead her to believe that George and/or Kevin Brown were "associated with MFSC". Since these material facts are disputed and in fact are not supported by the record of this case established thus far, Defendant's Motion must be denied. Furthermore, Plaintiffs have provided and/or are providing defendant with Request for Production of Documents, Interrogatories and a Notice of Deposition to conduct discovery regarding these disputed issues. Based on the fact that discovery has not yet been concluded, Defendant's Motion is premature and must be denied.

V.    **ARGUMENT**

   A.    **This Matter Is Not Eligible For Arbitration Under
          The Nasd Rules**

> NASD Rule 10101, entitled "Matters Eligible for Submission,"
> provides that:

> "Any dispute, claim, or controversy arising out of or in connection
> with the **business of any member of the Association**" is eligible
> for arbitration where the dispute is "between or among **members**
> or associated persons and **public customers**, or others[.]"  NASD
> Rule 10101 (emphasis added).

Accordingly, and in order for a dispute to be eligible for submission to arbitration, the following two-prong test must be met:  "First, a complaining party must be a customer of the NASD Member, and second, the 'dispute, claim, or controversy' must have arisen 'in connection with the business of such member.'"  Wheat First Securities, Inc. v. Green, 993 F.2d 814, 821 (11th Cir. 1993) (quoting NASD Rule 10101).

If a matter is eligible for submission to NASD arbitration under NASD Rule 10101, the following elements of NASD Rule 10301 must be satisfied before it shall be compelled to arbitration.

> NASD Rule 10301, in pertinent part, provides:

> Any dispute claim or controversy **eligible for submission under
> Rule 10100 Series** between a **customer** and a member and/or
> associated person arising in connection with the **business of such
> member** or in connection with the activities of such associated
> person shall be arbitrated under this Code, as provided by and duly
> executed and enforceable written agreement or upon demand of a
> customer.

NASD Rule 10301(a) (emphasis added).

   B.    **Arlene Brown Is Not A Public Customer Of Multi-Financial**

Various Federal District and Circuit courts have addressed the issue of whether an individual is a public customer of a broker-dealer under NASD Rule 10101 or 10301.  These

courts have held that in order for an individual to be deemed to be a customer for the purposes of NASD Rule 10101, there must be a business relationship with the NASD member that directly related to investment or brokerage services; an account or some other form of traditional customer relationship with the broker-dealer; the receipt by the individual of account statements from other broker-dealers; purchase of investments from the broker-dealers; and transactions involving the individual on the broker-dealer's books and records. See Fleet Boston Robertson Stevens, Inc. v. Innovex, 264 F.3d 770, 772 (8th Cir. 2001); Mony Securities Corp. v. Vasquez, 8:02-CV-1066 (M.D. Fla. August 13, 2002); Investors Capital Corp. v. Brown, 145 F. Supp.2d 1302 (M.D. Fla. 2001); and Wheat First Securities, Inc. v. Green, 993 F.2d 814 (11th Cir. 1993).

In Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc., 264 F.3d 770 (8th Cir. 2001), the Eighth Circuit held that the definition of customer as used in the NASD Code "refers to one involved in a business relationship with [a] NASD member that is related directly to investment or brokerage service." Id. at 772. Here, Robertson Stephens, NASD member broker-dealer, commenced a breach of contract action in Federal Court against defendant in an attempt to collect $800,000 in fees and expenses it was owed for providing advice to defendant regarding an acquisition. Id. at 770. Defendant thereafter filed a motion to compel arbitration under the Federal Arbitration Act. Id. The sole issue for the Eighth Circuit to decide was whether defendant was a customer of Robertson Stephens.[1]

In deciding this issue, the Eighth Circuit noted that such a determination hinged upon whether the term "customer" applies only to those who received investment or brokerage services, or to those who received banking and financial advice. Id. at 771. The Eighth Circuit found that the NASD Code does not offer a definitive definition of the term "customer." Id. 772. In so reaching its conclusion, the court noted that NASD Rule 0102(g), which states that a

"customer" is anyone not a "broker or dealer" was too broad to be a definition and was not set forth to "apply to every sort of financial advice an NASD member might provide, regardless of how remote that service might be from the investing or brokerage activities …." Id.

Moreover, the Eighth Circuit found that other NASD Rules support a general definition of "customer" as one "who receives investment and brokerage services or otherwise deals more directly with securities ...," or "any person who, in the regular course of such member's business, has cash or securities in possession of such member." Id. (quoting NASD Rules of Conduct § 2270). Accordingly, the Eighth Circuit held that the term "customer" in the NASD Code refers to "one involved in a business relationship with an NASD member that is directly related to investment or brokerage services[,]" and denied defendants' motion to compel arbitration. Id.

Additionally, in Investors Capital Corp. v. Brown, 145 F. Supp.2d 1302 (M.D.Fla. 2001), the court decided the same issue as presented in the instant matter. Here, defendants filed a statement of claim with the NASD against Investors Capital Corp. ("ICC") after they purchased unregistered promissory notes from Smith and Struab, who were registered representatives of ICC Id. at 1303. Smith and Staub sold the notes without the knowledge of or approval by ICC. Thereafter, ICC filed complaints in District Court seeking to enjoin the NASD arbitration because defendants were not customers of ICC. Id.

In reaching its decision, that defendants were enjoined from arbitration, the court noted that the NASD Code provides little guidance on the "customer" issue. Id. at 1306. Here, the court determined that defendants were not customers of ICC because they did not have any accounts or other evidence of a traditional customer relationships. Given this, the court held that in enjoining the NASD, broker dealers, like ICC "agree to arbitrate disputes with *its* customers rather than with every person associated with [the broker dealer]." Id. at 1308. The court further

---

[1] This is only court that focused on the eligibility requirements as stated in NASD Code 10101.

held that "[t]he opposite construction of Rule 10301 … 'would do significant injustice to the reasonable expectations of NASD members.'" Id. (quoting Wheat First Securities, Inc. v. Green, 993 F.2d 814, 820 (11th Cir. 1993)).

In Mony Securities Corp. v. Vasquez, 8:02-CV-1066 (M.D.Fla. August 13, 2002)[2], another district court was again confronted with the same issue presently before this court.  Here, the Vasquezes filed a Statement of Claim with the NASD asserting claims against, *inter alia*, Mony Securities Corp. ("Mony") in connection with their investment in certain mutual funds that were purchased directly from the mutual fund company.  Id. at 1.  More specifically, the Vasquezes asserted that their purchase of said mutual funds was based upon the recommendation of a registered representative of Mony.  Id. at 2.  Similar to the actions of Multi-Financial in the present case, Mony, upon receiving a copy of the Statement of Claim filed an injunction in Federal Court for the Middle District of Florida moving to enjoin the Vasquezes' from proceeding to arbitration because the Vasquezes were "never customers of [Mony] and that their claims do not 'arise out of or in connection with' [Mony's] business."  Id.  After reviewing the evidence and hearing oral argument, the court found that Mony was entitled to a preliminary injunction.  Id.

On the issue of whether the Vasquezes were customers of Mony, the court found that NASD Rule 10101 provides a two-prong test that states: "'[A]ny dispute, claim, or controversy arising out of or in connection with the business of any member of the Association'" is eligible for arbitration: "'First, a complaining party [is] a customer of the NASD member, and second, [where] the 'dispute, claim, or controversy' … [arises] 'in connection with the business of such

---

[2] Multi-Financial has attached a copy of the case as Exhibit "H."  Additionally, this court fails to address NASD Rule 10101 regarding matters eligible for submission to arbitration.  Rather, the court merely jumps right to mandatory arbitration rule at NASD Code 10301.

member.'"  Id. at 4 (quoting NASD Rule 10101 and Wheat First Securities, Inc. v. Green, 993 F.2d 814, 821 (11th Cir. 1993)).

Since the NASD Code of Arbitration Procedure provided little guidance as to a definition of customer, the court relied on the decision of Investors Capital Corp. v. Brown, supra, in granting Monys' preliminary injunction.  The court held that the Vasquezes never entered into an account agreement with Mony; they never received any account statements from Mony; and they never purchased any investment products from Mony.  Id. at 6.  The court also found that Mony did not offer the mutual funds purchased by the Vasquezes, and no transactions involving the Vasquezes appear on Mony's books or records.  Id.  Accordingly, the court found that the overwhelming evidence showed that the Vasquezes were not "customers," and thus, no agreement to arbitrate existed.  Id.

As applied to the instant matter, Brown was not a customer of Multi-Financial.  Here, Brown only met with George and/or Kevin Brown for the purpose of obtaining estate-planning advice on asset protection.  Additionally, the undisputed evidence shows that Brown never entered into an account agreement with Multi-Financial; she never received any account statements or confirmations from Multi-Financial; and she never purchased any investment products from Multi-Financial which appeared on its books and records.  To the contrary, Brown established an offshore trust account with Intrados as trustee.  The trustee purchased and owned the Honor, F.A. Certificates which allegedly led to Brown's losses.

Therefore, it is clear that Brown was not a customer of Multi-Financial at the time that she placed monies into an offshore trust because at no time did she ever establish a business relationship with Multi-Financial, a NASD member.  Accordingly, Brown has failed to met the

first-prong of the arbitration eligibility test that is required for a matter to compelled to arbitration. Therefore, Brown's Motion must be denied in its entirety.

Furthermore, in <u>Oppenheimer and Company, Inc. v. Neidhardt</u>, 56 F.3d 352 (2d Cir. 1995) (a case relied upon defendant), defendant/investors initiated an arbitration matter before the NASD. The defendant/investors alleged that they decided to open an Oppenheimer account, deposit funds into their Oppenheimer account which would be serviced by Oppenheimer broker DeSimone. However, DeSimone fraudulently deposited the defendant/investors funds into an Oppenheimer account in the name of two individuals who, thereafter, conspired with DeSimone to divert and/or steal money from the Oppenheimer account. Oppenheimer sought to obtain an injunction seeking to stay the arbitration since claimants in the underlying matter were not customers of Oppenheimer. However, the court held that the defendant/investors were customers since they attempted to open an account with Oppenheimer and, therefore, would not be stripped of their customer status merely because an Oppenheimer broker failed to open said account and since they dealt with an Oppenheimer broker in that regard. Moreover, the court also held that "had Oppenheimer offered evidence that it was the claimants rather than Oppenheimer's representative, who contrived to place their funds in the EAF account under the control of Biemer & Herrling, this might have raised different considerations, but no such evidence was offered." <u>Id</u>. at 357-358.

In the instant matter, plaintiffs have offered evidence that it was Defendant Brown who contrived to place her funds in the Intrados account under the control of Intrados. Brown placed her funds in the Intrados, off-shore trust account, for the purpose of asset protection in light of her prior marital difficulties. Plaintiff's proffering of such evidence clearly indicates that

claimants intention through her establishing an offshore trust account with Intrados indicates was not to establish a customer relationship with Multi-Financial.

Therefore, based upon the foregoing, defendant is not a customer of Multi and her Motion must be denied.

### C.    This Matter Is Not A "Selling Away" Case Which Must Be Compelled To Arbitration Nor By Any Case And Cited By Defendant

In Defendant's Motion, she alleges that this is a "selling away case" and in determining whether to compel arbitration in cases of this kind, the alleged "touchstone" is whether the investor was aware of the relationship between the associated person and the member firm.  (See Page 6.)  However, the cases which are relied upon by the defendant did not stand for that proposition and are easily distinguishable from the instant matter and this is not a "selling away" case.  According to defendant's authority, a "selling away" case involves the sale of securities by a registered representative without the approval or knowledge of the broker-dealer.  However, in this case, the defendant was not the purchase of any security or promissory note.  Therefore, Defendant's NASD Statement of Claim is prima facially deficient and may not form the basis of liability to Multi.  Furthermore, the defendants case law upon which she relies is easily distinguishable to the instant matter.

In <u>WMA Securities v. Ruppert</u>, ADF.Supp. 2d 786, 789 S.D. Ohio (1999), the defendant investors purchased promissory notes from the broker-dealer's associated persons.  The court held that by receiving the advise of the registered representative and making <u>securities</u> purchases through him, the defendant/investors conducted business with an associated person of the broker-dealer and thus became customers of the broker-dealer under the NASD Rules.  However, in the instant matter, defendant never purchased any security through George or Kevin Brown.  To the

contrary, Intrados, as trustee, purchased the complained of promissory notes in an offshore asset

protection trust account.  Therefore, the WMA case is distinguishable from the instant matter.

In <u>Vestax Securities Corp.v. McWood</u>, 280 F.3d 1078 (6th Cir. 2002) the defendant,

investors purchased <u>securities</u> at the recommendation of the broker-dealer's registered

representative but through a separate broker-dealer.  By conducting such <u>securities business</u> with

plaintiffs' registered representative, defendants conducted business with the broker-dealer and

became its customers.  However, in the instant matter, Defendant/Brown did not purchase any

securities which, to the contrary, were purchased by Intrados as trustee.

In <u>John Hancock Life Ins. V. Wilson</u>, 254 F.3d 48, 51 (2nd Cir.) 2001,

defendant/investors, purchased <u>promissory notes</u> through the broker-dealer's registered

representatives.  The court held that NASD Code Rule 0120(g) defined customer broadly

excluding only a broker-dealer.  Since the investors were not broker-dealers, the court concluded

that the investors were customers of the broker-dealer.  However, in the concurring opinion, the

court held that if there was extrinsic evidence provided to the court, that the drafters of NASD

Rule 10301(a) intended that an investor must be a customer of the member-and not just a

customer of an associated person of the member then the court would be constrained to follow

such extrinsic evidence.  As discussed below, plaintiffs have attached affidavits from the drafters

of NASD Rule 10301 which clearly indicates that NASD Rule 10301(a) intended that an investor

must be a customer of the member and not just a customer of the associated person of the

member.  Furthermore, the John Hancock decision involved the purchase of securities by the

investor and, in the instant matter, Defendant Brown did not purchase any securities.

Finally, in <u>BMA Financial Services, Inc. v. Guin</u>, 165 F. Supp. 2d 813, 816 (W.D. LA

2001), the defendant/investors purchased <u>promissory notes</u> through the broker-dealers associated

person.  The court held that the investors/defendants were customers merely because they are customers of the associated person.  However, in the instant matter, defendant did not purchase securities through George and/or Kevin Brown and to the contrary, the promissory notes were purchased by offshore trustee, Intrados.

Essentially, defendant is asking this court to hold that she is a customer although she did not engage in any securities transactions with Multi-Financial's former registered representatives. Defendant would, in effect, seek this court to opine that any individual who engaged in any non-securities transactions with a broker-dealer's registered representatives is a customer of the broker-dealer.  For example, if an individual purchased an automobile, real estate, property insurance, etc., such an individual would not only be a customer of the registered representative but also a customer of the broker-dealer and that the broker-dealer would be obligated to arbitrate any such claims arising out of such a transaction at arbitration before the NASD.  Such a result is not only absurd but illogical and must not be considered by the court.

### D.    The Drafters of the NASD Code of Arbitration Procedure Never Intended That a Member Firm Be Compelled to Arbitrate Disputes with Non-Customers

The securities arbitration system was designed to implement the third point of President Ford's July 10, 1975 regulatory reform plan — responsiveness to consumers, including the handling of customer complaints.  SEC Release No. 12528 (June 9, 1976).  One prong of this system was the "development of a model and uniform system of dispute grievance procedures …." Id.  To aid in implementing this system, the SEC appointed a task force (SICA) to develop a uniform arbitration code and help create an efficient system for resolving investor disputes. Williams Decl., Exh. A, Hoblin Decl., Ex. D [Second SICA Report to the SEC (December 28, 1978)].

In its Second Report, SICA told the SEC that the Uniform Code of Arbitration Procedure, which had already been approved by the board of the NASD and other self-regulatory organizations "provides for arbitration of disputes between customers and securities industry organizations and individuals. . ." Id., p.3 (emphasis added). Similarly the Report describes the procedure by which a "customer may initiate an arbitration. . ." Id., p.4 (emphasis added).

Phil Hoblin, Jr. was a member of SICA and one of the drafters of the Uniform Code of Arbitration Procedure, adopted by the NASD and other SROs to streamline the alternative dispute resolution process. Hoblin supports Multi-Financial's interpretation of Rule 10301(a), confirming that the drafters of the Uniform Code never intended the mandatory arbitration provision of Rule 10301(a) to extend to individuals who were not customers of the broker-dealer. Williams Decl., Ex. D, Hoblin Decl.

The drafters did not specifically address arbitrability of disputes brought by customers of registered representatives who were not customers of broker-dealers because they simply did not contemplate the arising of this situation in broker-dealer arbitration. Id., p.2. The advent of independent contractor representatives scattered across the country has caused an increase in selling away activity despite the implementation of proper supervisory procedures by broker-dealers. This change has spawned numerous arbitrations brought by individuals who dealt with registered representatives without the broker-dealer's knowledge of the individuals' existence and despite the broker-dealer's reasonable steps to supervise its independent contractors.

One of the first four Directors of Arbitration for the NASD —Thomas Wiltrakis — concurs with Hoblin's analysis. He also believes that it was not the intent of those who designed the NASD arbitration process and drafted the Uniform Code that broker-dealers would be

required to submit to mandatory arbitration of disputes with non-customers. Williams Decl., Ex. E, Wiltrakis Decl.

This kind of extrinsic evidence of intent and meaning — the kind the Second Circuit sought — was not a part of the record before the courts deciding Hancock, Vestax and the WMA cases. Williams Decl., Ex. F, Declaration of Carolyn Nussbaum; Ex. G, Declaration of Marion H. Little, Jr.; Ex. H, Declaration of Kevin McDermott. This Court is, therefore, faced with a different situation legally and is bound to follow the intent of the drafters of the Uniform Code.

Other courts have recognized that construing a broker-dealer's membership in the NASD as evidence of the broker-dealer's agreement to arbitrate disputes with customers of every person associated with the broker-dealer would "do significant injustice to the reasonable expectations of NASD members." Wheat, First Sec., Inc. v. Green, 993 F.2d 814, 820 (11th Cir. 1993). While Multi-Financial expects to, and will, arbitrate disputes with other members, associated persons or its customers, Multi-Financial does not hold the same expectation with regard to any person who may transact business with one of its registered representatives. To do so forces Multi-Financial to forego its rights and the protections of civil proceedings (including its right to a jury trial, full-blown discovery, and to appeal) in cases brought by total strangers and matters with respect to which Multi-Financial has no knowledge and did not participate in.

The United States District Court for the Middle District of Florida has also held that "in joining the NASD, [the broker-dealer] agreed to arbitrate disputes with its customers, rather than the customers of every [associated person]." Investors Capital, 145 F. Supp. 2d at 1308. Firms like Multi-Financial agree to arbitrate disputes with their customers and forego the protections of civil process in exchange for the short form provisions of arbitration where the firm knows that customer, has chosen to do business with that customer, and has participated in the transactions

at issue. This baseline knowledge of the Brown and his transactions is lacking where the Brown is a total stranger to the firm. Multi-Financial has not agreed, by virtue of its NASD membership, to arbitrate disputes with total strangers like defendants. The history of NASD arbitration and the intent of the Uniform Code drafters make clear that, as a non-customer, Brown has no power to force Multi-Financial to submit this action to arbitration. Therefore, Brown's Motion must be denied in its entirety.

Accordingly, Brown has failed to met the first-prong of the arbitration eligibility test that is required for a matter to compelled to arbitration. Therefore, Brown's Motion must be denied in its entirety.

### E.    Brown's Dispute Does Not Arise In Connection With Multi-Financial's Business And Does Not Satisfy The First Element Of NASD Rule 10101 or Second Element of Rule 10301

Brown, in her Motion, alleges that Multi-Financial had an obligation to supervise George and Kevin Brown in their sale of these alleged promissory notes and that such "failure to supervise" arises in connection with Multi-Financial's business. See Brown's Motion to Compel Arbitration/Motion for Summary Judgment. In further support of their argument, Brown relies on Royal Alliance Assoc. v. Davis, 897 F. Supp. 783 (S.D.N.Y. 1995, for the proposition that a dispute that arises from a firm's lack of supervision arises in connection with member firm's business. See id. Royal Alliance, however, is factually distinguishable from this matter.

In Royal Alliance, respondents were customers of Royal Alliance who had purchased promissory notes from a registered representative of Royal Alliance. See id. Respondents' allegations were based on this registered representative borrowing monies, by way of the promissory notes, which came from plaintiff's Royal Alliance accounts. See id. The court found

that Royal Alliance had a duty to supervise its registered representative regarding the sale of the promissory notes and that such a duty arose in connection with its business. See id.

In the instant matter, Brown, unlike the respondents in Royal Alliance, did not purchase a promissory note from George or Kevin Brown. The Honor, F.A. Certificate was purchased and owned by Intrados. In fact, Brown merely placed money in an offshore trust for the purposes of asset protection. Brown's placing money in the offshore trust by itself did not lead to any losses. See Exhibits "A" and "B." To the contrary, the complained of losses occurred only when the trustee decided to exercise its discretion and purchase the Honor, F.A. Certificates which were later somehow sold or exchanged by the trustee for the Evergreen notes. It was the owners and operators of Evergreen who apparently misappropriated the depositors fund. The Royal Alliance case relied upon by Brown does not stand for the proposition that Multi had a duty to supervise Intrados as an offshore Costa Rica trustee with respect to its decision to purchase certificates, promissory notes or anything else. Clearly Multi cannot and does not have an obligation to control and/or supervise such unrelated, independent and foreign corporations. In fact, NASD panels have dismissed claims against broker-dealers arising out of Evergreen because the claimant did not engage in any securities transactions. (See Exhibit "J").

Accordingly, Brown has failed to meet the two-prong eligibility test for NASD arbitration. Therefore, her Motion must be denied in its entirety.

**F.    Arbitration Must Not Be Compelled Under A Theory Of
         Apparent Authority**

Finally, Defendant takes the position that the allegations of Defendant's Statement of Claim must be arbitrated since George and/or Kevin Brown were acting with "apparent authority" on behalf of Multi-Financial with respect to their alleged sale of Evergreen promissory notes to defendant. (See Pages 6 and 16.) Defendant contends that the Courts have held

brokerage firms responsible for the unauthorized acts of their registered representatives particularly in "selling away" cases under a theory of apparent authority.

As a threshold matter, and as discussed in detail above, George and/or Kevin Brown did not sell promissory notes to defendant. To the contrary, the promissory notes were purchased in an off-shore trust account in which the trustee, Intrados, allegedly purchased the promissory notes. (See exhibits attached to Plaintiff's Complaint.) Therefore, the basic fact upon which Defendant relies for her argument that this matter must be compelled to arbitration because George and/or Kevin Brown acted with "apparent authority" on behalf of Multi-Financial with respect to these alleged promissory note sales is simply incorrect. Therefore, defendant's argument in this regard must be rejected by the Court.

Furthermore, and as a matter of law, even if this were a selling away case involving the sale of promissory notes to an investor/defendant, the law does not require arbitration of claims based upon "apparent authority". Pennsylvania courts defined "apparent authority" as that "authority which, although not actually granted, the principal knowingly permits the agent to exercise, or holds him out as possessing." T&G Equipment v. F. Nat. B. Green Castle, 764 F.2d 950 (3rd Cir. 1985), citing Revere Press, Inc. v. Bloomberg, 431 Pa. 370, 246 A.2d 407, 410 (1968).

The concept of apparent authority focuses on the relationship between Multi-Financial and Defendant/Brown, or, more importantly, the absence of such a relationship. In Harrison v. Dean Witter Reynolds, Inc., 715 F. Supp. 1425 (N.D. Ill. 1989) rev'd on other grounds, 974 F.2d 873 (7th Cir. 1992), plaintiff alleged that the employment registered representatives by the defendant broker-dealer, coupled with the use of the broker-dealer's telephone and its failure to uncover the registered representative's scheme to defraud investors through unauthorized trades

in a separate account at an unrelated bank.  The Court found that the brokers were not acting

within the scope of their employment in the conduct of the scheme and, therefore, had no actual

authority to engage in this conduct.  The Court also found that the mere employment of the

registered representative by the defendant broker-dealer, coupled with the use of the broker-

dealer's telephone and its failure to uncover the scheme was not enough to impute "apparent

authority".

Quoting the U.S. Supreme Court, the Harrison Court stated that a precursor for any

"apparent authority" theory is that, "from the point of view of the third person, the transaction

seems regular on its face and the agent appears to be acting in the ordinary course of the business

confided in him."  715 F. Supp. At 1431-2 (quoting from <u>American Society of Mechanical</u>

<u>Engineers, Inc. v. Hydrolevel Corp.</u>, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982)).  The

Harrison Court further explained that:  "When an individual has notice that an employee is

exceeding the scope of his authority, the individual cannot rely on the employee's manifestations

alone and then claim apparent authority."  <u>Harrison</u>, 715 F. Supp. At 1432.  While taking into

account the unorthodox bank and the fact that the plaintiff never received a single receipt,

statement or other communication bearing the broker-dealer's name as to such matter, the Court

ruled that no "apparent authority" existed.

In <u>Kohn v. Optik, Inc.</u>, 1993 U.S. Dist. Lexis 7298 (C.D. Cal. 1993), the court found that

broker-dealer Prudential Securities was not liable under a theory of "apparent authority" because

the complained of transactions were inherently irregular.  There, a registered representative of

Prudential sold the ventures in Optik, Inc., an investment not approved by Prudential for sale by

its registered representatives.  In seeking to recoup the losses, plaintiff contended that Prudential

was liable under the Doctrine of Respondeat Superior, that the registered representative had the apparent authority to sell the Optik ventures.

In regard to the "apparent authority" argument advanced by the plaintiff, the Court stated:

> Where the employer's actions give the third party reason to believe that the employee is acting within the employer's authority, the employer may be bound by such acts even if the employee actually lacked authority … however, **where the irregularity of the actions of the employee provide notice to the third party that the employee is acting outside the scope of the employee's employment, the employer is not bound by the employee's actions as no apparent authority exists.**

> Id. at 17 (citations omitted) (emphasis added)

In that case, the Court found that the plaintiff did not send her checks to Prudential, nor did the plaintiff ever receive a single receipt, statement or other communication bearing Prudential's name in regard to her investment in the Optik ventures.  Thus, the irregularity of the transaction at issue provided notice to the plaintiff that the registered representative was acting outside the scope of its employment.  Id. at 18.

In the instant matter, in support of defendant's argument that "apparent authority" is a proper basis for compelling a matter to arbitration, defendant relies upon a number of decisions. However, none of these decisions stand for the proposition that a broker's "apparent authority" to engage in the complained of conduct in any way serves as a basis to call the matter to arbitration. These cases, John Hancock Life Ins. v. Wilson, Oppenheimer & Co. v. Neidhardt, WMA Securities v. Ruppert, BMA Financial Services v. Gwin, Fast Act Securities Corporation v. McWood have been previously discussed in this brief and none of these cases does not stand for the proposition as contended by defendant.

However, even if these cases stood for the proposition that an agent's "apparent authority" could be a sufficient basis to compel a matter to arbitration, the facts of this case do not allow for

any finding of apparent authority on behalf of George and/or Kevin Brown to sell Evergreen

promissory notes to defendant.  First and foremost, the Browns did not sell Evergreen

promissory notes to Defendant/Brown, to the contrary such notes were allegedly purchased by

Intrados, as trustee in the offshore asset protection trust established by Defendant Brown.

Defendant could not have believed that George or Kevin Brown acted with apparent authority

since the complained of conduct [promissory note sale] is not attributed to either George and/or

Kevin Brown.  Therefore, the facts of this case are easily distinguishable from any of the cases

cited by defendant in her Motion.

**V.    BROWN'S ARBITRATION MUST BE ENJOINED PENDING THIS COURT'S
        ARBITRABILITY DETERMINATION**

    **A.    Standard for Preliminary Injunction**

The purpose of a preliminary injunction is to preserve the status quo pending either a

permanent injunction or a trial on the merits.  Alliance Bond Fund, Inc. v. Grupo Mexicano de

Desarrollo, S.A., 143 F.3d 688, 692 (2d Cir. 1998), *rev'd on other grounds*, 527 U.S. 308 (1999).

In order to obtain a preliminary injunction, the plaintiff must satisfy the four–factor test

established in Blackwelder Furniture Co. v. Selig Mfg. Co., 550 F.2d 189 (4th Cir. 1977).

Specifically, the courts must consider the following factors:

    (1)    the likelihood of irreparable harm to the plaintiff if the preliminary injunction is
           denied;

    (2)    the likelihood of harm to the defendant if the request is granted;

    (3)    the likelihood that the plaintiff will succeed on the merits; and

    (4)     the public interest.

 Id. at 195-97; Microstrategy Inc. v. Motorola, Inc., 245 F.3d 335, 339 (4th Cir. 2001); Direx

Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 812 (4th Cir. 1991).  In analyzing these

factors, "[t]he first step … is for the court to balance the 'likelihood' of irreparable harm to the plaintiff against the 'likelihood' of harm to the defendant; and if a decided imbalance of hardship should appear in the plaintiff's favor, then …[i]t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation." Microstrategy, 245 F.3d. at 339 (citing Blackwelder, 550 F. 2d at 195).  However, 'if 'the plight of the defendant [is] not substantially different from that of the plaintiffs, that is, if there is no imbalance of hardship in favor of the plaintiff, then the 'probability of success begins to assume real significance,' and interim relief is more likely to require a clear showing of a likelihood of success." Id. (citing Direx, 952 F.2d at 808) (quoting Blackwelder, 550 F.2d at 195 n. 3)).  Here, upon consideration of all four factors, Multi-Financial is entitled to a preliminary injunction, which is the only way to preserve the status quo.

**B.    The Likelihood of Irreparable Harm to Multi-Financial Outweighs Any Harm to Defendants**

Arbitration is a matter of contract and a party cannot be required to submit to arbitration where there is no such agreement.  AT&T Technologies, Inc. v. Communications Workers, 475 U.S. 643, 648-49 (1986).  To require arbitration where a party has not agreed to arbitrate would deprive that party of its constitutional right to a jury trial.  In this case, Multi-Financial, through its membership in the NASD, has agreed to arbitrate claims arising from its business with its customers.  It has not agreed to arbitrate the claims of strangers with whom it had no business relationship like defendants.  If Brown's arbitration is not enjoined, Multi-Financial will have been deprived of its constitutional right to a jury trial.  The impairment of a party's constitutional rights constitutes irreparable harm. Henry v. Greenville Airport Comm'n, 284 F.2d 631, 633 (4th Cir. 1960); Planned Parenthood v. Citizens For Community Action, 558 F.2d 861, 867 (8th Cir. 1971); Cannon v. North Carolina State Board of Education, 917 F. Supp. 387, 391 (E.D.N.C.

1996).  Here, Multi-Financial has not knowingly or voluntarily waived its right to a jury trial and will be irreparably harmed by the deprivation of its constitutional rights if injunctive relief is not granted.  In contrast, Brown — who did not contract for the right to arbitrate these disputes — has the litigation forum available to her.

If Brown's arbitration is not enjoined, Multi-Financial will have lost the protections of civil process, including its right to conduct full-blown discovery, its right to a jury trial, its right to have a judge preside over the proceeding, and its rights of appeal.  With a NASD arbitration, these protections are absent and the ability to conduct discovery, the right to appeal, and the power to vacate an award are limited.  Here, Brown seeks to force Multi-Financial to waive its right to the protection of civil process in a matter in which they seek in excess of $50,000 in damages.  Rice Decl., Exh. 1, pp. 10-11, 37, 43-44, 47, 49.  While brokerage firms are willing to forego the procedural protections of the courts for streamline arbitration with people with whom they do business, it is a much different situation to force them to forego these rights with respect to total strangers.  In the case of the arbitration with a customer, the firm has chosen to do business with the Brown, most likely has an agreement with him, has had to comply with the "know your customer rule," and generally has information with respect to the Brown and his transactions.  This is not the case where the Brown and his transactions are total strangers to the firm.

Here, Browns and her complained of transactions are total strangers to Multi-Financial.  Multi-Financial does not have any information concerning Brown and was not involved in any way with their complained of transactions.  If injunctive relief is not granted, the arbitration proceeds through hearing without the benefit of the procedures afforded in a court proceeding, and it is later determined that the disputes were not properly before the panel, the damage will be

irreversible. Multi-Financial was required to bring its defenses before a tribunal that has no jurisdiction over it without the protections and procedures of a court proceeding, to which it is entitled. If no injunction is issued, Multi-Financial will be permanently deprived of its constitutional right to resort to a judicial tribunal for resolution of these claims. Moreover, Multi-Financial will be forced to incur tens of thousands of dollars in legal expenses defending itself in a forum to which it is not required to submit.

On the other hand, enjoining this arbitration pending this court's arbitrability determination will not harm defendant. Injunctive relief will merely cause a delay in the proceedings.[3] If this Court ultimately determines that the dispute is not arbitrable, defendant's claims will be preserved for resolution before a court. If the Court determines that the dispute must be arbitrated, no harm will have come to the defendant and the arbitration will continue.[4] The decided imbalance of hardship in favor to Multi-Financial weighs in favor of granting the injunction.

### C.    Multi-Financial Will Succeed On The Merits Of Its Claims

Given the decided imbalance of hardship in favor of Multi-Financial, it has only to raise questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair ground for litigation. Microstrategy, 245 F.3d at 339 (citing Blackwelder, 550 F.2d at 195). Here, Multi-Financial can more than satisfy this requirement.

### 1.    The Arbitrability Determination Is For This Court

A party cannot be compelled to arbitrate a dispute unless it has agreed to do so. Where there is no contract, there can be no agreement to arbitrate. AT&T Technologies, Inc. v. Communications Workers, 475 U.S. 643, 648 (1986)(citing Steelworkers v. Warrior & Gut

---

[3] The NASD has not yet set a hearing date for the claims brought by Browns John Aune and John Hoffman.

Navigation Co., 363 U.S. 574, 582 (1960)).  Here, Brown is a stranger to Multi-Financial.

Multi-Financial never entered into any agreements, or agreed to arbitrate disputes, with them.

Moreover, whether a dispute is arbitrable is a question for resolution by a court. AT&T,

475 U.S. at 649 (unless parties "clearly and unmistakably provide otherwise, the question of

whether the parties agreed to arbitrate is to be decided by the court . . . "); Glass v. Kidder

Peabody & Co., Inc., 114 F.3d 446, 453-454 (4th Cir. 1997); Virginia Carolina Tools, Inc. v.

International Tool Supply, Inc., 984 F.2d 113, 116-117 (4th Cir. 1993), cert. denied, 508 U.S. 960

(1993); John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48, 53 (2d Cir. 2001).  "Courts should

not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and

unmistakabl[e]' evidence they did so." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938,

944 (1995) (quoting AT&T).  There is, however, no agreement of any kind between Defendants

and Multi-Financial, including any agreement to arbitrate the issue of arbitrability. Instead,

Defendants rely on Multi-Financial's membership in the NASD as support for their claim that

Multi-Financial must arbitrate their dispute.  As recognized by the Second Circuit in Hancock,

"one party's membership in the NASD, in the absence of a separate agreement between the

parties, cannot constitute a clear and unmistakable intent to submit the arbitrability of their

disputes to the arbitrators . . ." Hancock, 254 F.3d at 55.  Thus, this Court, not an arbitration

panel, must determine whether Multi-Financial can be compelled to arbitrate this dispute with

Defendants, who were not and are not Multi-Financial customers.

### 2.    Brown's Claims Against Multi-Financial Are Not Arbitrable

As discussed at length above, Brown's claims against Multi-Financial are not arbitratable.

In instant matter, Brown has undisputedly failed to establish that she was a customer of Multi-

---

[4] Defendants seek pre-judgment interest.  Rice Decl., Exh. 1, pp. 49-50, 52, 54.  Defendants will, therefore, be compensated for any extra time, which elapses pending this Court's determination.

Financial.  Here, Brown only met with George and/or Kevin Brown for the purpose of obtaining estate-planning advice.  Additionally, the undisputed evidence shows that Brown never entered into an account agreement with Multi-Financial; she never received any account statements or confirmations from Multi-Financial; and she never purchased any investment products from Multi-Financial.  Moreover, the offshore trust opened at Intrados is not the type of service that Multi-Financial provides and transactions involving Brown's actions of sending Intrados monies to invest do not appear on their books.  Lastly, Multi-Financial did not receive any compensation from Brown's placing monies in an offshore account held with Intrados.  Therefore, it is clear that Brown was not a customer of Multi-Financial at the time that she placed monies into an offshore trust because at no time did she ever establish a business relationship with Multi-Financial, a NASD member, that was related directly to investment or brokerage services.

**D.    <u>The Public Interest Favors Granting The Injunction</u>**

The public interest does not favor forcing parties to arbitrate where they have not agreed to do so. A party's waiver of the constitutional right to jury must be knowing and voluntary. <u>Aetna Ins. Co. v. Kennedy</u>, 301 U.S. 389, 393 (1936); <u>Brady v. United States</u>, 397 U.S. 742, 748 (1970); <u>United States v. Akinseye</u>, 802 F.2d 740, 745 (4th Cir. 1986).  The public interest weighs in favor of refusing to hold parties to agreements they did not make or coerce them into dispute forums to which they did not agree to submit.

The jurisdiction of a tribunal hearing a dispute is subject to challenge throughout a proceeding. The question of whether Brown's dispute is arbitrable should be reviewed and resolved before depriving Multi-Financial of its constitutional rights.

Accordingly, this Court must enjoin the arbitration proceedings pending a determination of whether the Uniform Code requires member firms to arbitrate disputes with non-customers.

The intent of the drafters of the Uniform Code, as revealed in their declarations, provides the guidance that courts which previously considered the arbitrability issue sought and lacked. That intent makes clear that member firms such as Multi-Financial are not required to arbitrate with total strangers who were never its customers. This arbitration must be enjoined.

## VI.  <u>CONCLUSION</u>

NASD rules require that for a matter to eligible for arbitration, such matter must be between a public customer of a NASD member and arise in connection with the business of such member.  Defendant, Arlene Brown, is not a public customer of Plaintiff, Multi-Financial, and her allegations of investment losses do not arise in connection with the business of Multi-Financial.  Accordingly, and pursuant to NASD rules, Defendant, Arlene Brown, cannot force Plaintiff, Multi-Financial, to arbitrate these matters, and therefore, Defendant, Arlene Brown's, Motion to Compel Arbitration/Motion for Summary Judgment must be dismissed.

Additionally, this Court must enjoin the arbitration proceedings pending a determination of whether the Uniform Code requires member firms to arbitrate disputes with non-customers. The intent of the drafters of the Uniform Code, as revealed in their declarations, provides the guidance that courts which previously considered the arbitrability issue sought and lacked. That intent makes clear that member firms such as Multi-Financial are not required to arbitrate with total strangers who were never its customers. This arbitration must be enjoined.

<div style="margin-left:40%">

MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN


BY:  _____
     DENIS C. DICE, ESQUIRE
     Identification No. 59276
     1845 Walnut Street
     Philadelphia, PA  19103
     (215) 575-2779

</div>

DATED:  _____

## <u>CERTIFICATE OF SERVICE</u>

I, DENIS C. DICE, ESQUIRE, hereby certify that I am attorney for Plaintiff, Multi-

Financial Securities Corp., in the within action; that I am duly authorized to make this

certification and that on the 25th day of September, 2002, I did cause a true and correct copy of

the within Response to Defendant's Motion to Compel Arbitration/Motion for Summary

Judgment to be served upon all counsel listed below:

Nicholas J. Guiliano, Esquire
1500 Walnut Street
Suite 1100
Philadelphia, PA  19102

Matthew Farley, Esquire
Drinker, Biddle & Reath, LLP
30 Broad Street
30th Floor
New York, NY  10004

MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN

BY:    _____
DENIS C. DICE, ESQUIRE

DATED: _____

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MULTI-FINANCIAL SECURITIES CORP. | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 02-3828 |
| | : | |
| vs. | : | |
| | : | |
| ARLENE BROWN | : | |
| | : | |
| Defendant. | : | |

## <u>ORDER</u>

AND NOW, this        day of                  , 2002, it is hereby ORDERED and DECREED that Defendant's Motion to Compel Arbitration and Motion for Summary Judgment is DENIED.

BY THE COURT:

_____

Legrome D. Davis                    J.